**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| MELVIN W. BRINKLEY, On Behalf Of Himself And All Others Similarly Situated, | Civil Action No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| AMEDISYS, INC., WILLIAM F. BORNE, and DALE E. REDMAN, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Melvin W. Brinkley brings this federal securities law class action on behalf of himself and all other persons and entities who purchased or acquired the publicly traded securities of Amedisys, Inc. ("Amedisys" or the "Company") between April 30, 2008 and July 12, 2010 (the "Class Period"), and who were damaged by the conduct asserted herein (the "Class").

I.    **INTRODUCTION**

1.      Amedisys is a provider of high-quality, low-cost home health services to the chronic, co-morbid, aging American population. The Company earns its net service revenue through its home health and hospice agencies by providing a variety of services almost exclusively in the homes of its patients. The Company's services are primarily paid for by Medicare, which represented approximately 88%, 87%, and 89% of the Company's net service revenue in 2009, 2008 and 2007 respectively. The Company expects that home health and hospice services reimbursed by Medicare will remain its primary focus over the near and

intermediate term.

2.      This securities fraud action seeks damages on behalf of members of the Class resulting from a fraudulent income-generating scheme implemented by defendants to boost the Company's financial results and thereby artificially inflate the Company's stock price. Specifically, as described below, Amedisys, together with its Chief Executive Officer ("CEO") William F. Borne ("Borne") and Chief Financial Officer ("CFO") Dale E. Redman ("Redman") (collectively, the "Individual Defendants") engaged in a fraudulent income-generating scheme to repeatedly inflate the Company's publicly reported revenue and earnings by pushing patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured the Company more Medicare reimbursements, and as a result, issued materially false and misleading financial results to investors.

3.      Throughout the Class Period, defendants repeatedly lauded the Company's "record revenue," but failed to reveal that part of the Company's revenue was created by defendants' fraudulent income-generating scheme.

4.      Moreover, defendants made false and misleading statements and/or failed to disclose that: (i) the Company's publicly reported revenue and earnings growth were materially inflated by the Company's fraudulent income-generating scheme of pushing patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured the Company more in Medicare reimbursements; (ii)  part of the Company's net service revenue and earnings was subject to recoupment by Medicare; (iii) the Company violated its Code of Ethical Business Conduct due to its fraudulent income-generating scheme to inflate Medicare revenue; and (iv) the Company lacked effective internal controls, particularly over its patient recertification and billing processes.

5.      On April 26, 2010, *The Wall Street Journal* ("WSJ") published an article, *Home Care Yields Medicare Bounty*, ("April 26 WSJ Article") questioning whether health-care companies, including Amedisys, were taking advantage of the Medicare reimbursement system by clustering at-home therapy visits around Medicare reimbursement targets.  According to the

2

article, Medicare paid companies a flat fee up to nine home therapy visits, and an additional reimbursement of roughly $2,200 was paid if the therapy surpassed nine visits. The article reported that "Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more." A former Amedisys nurse was quoted as saying that "[t]he tenth visit was not always medically necessary." The article states that even after Medicare changed its rule in January 2008 to provide new reimbursement thresholds, the Company continued its pattern of clustering at-home therapy visits around the new reimbursement thresholds. As a result of this news, the Company's stock closed at $56.52 on April 27, 2010, dropping 6.58% on heavy trading volume, compared to a close of $60.5 on April 26, 2010.

6. Then, on May 12, 2010, after the market closed, the WSJ published a follow-up article in which it reported that the Senate Finance Committee sent a letter on May 12, 2010 to the Company informing it that they had started an investigation into the billing and operating practices of Amedisys. The May 12, 2010 Senate Finance Committee letter referenced the April 26 WSJ Article and requested the Company to produce thirteen different categories of documents, including data regarding therapy visits covering 2006 through 2009. In addition, the Senate Finance Committee questioned the Company's marketing materials that aim to target seniors "[to take] advantage of Medicare payments in order to improve company profits." After the announcement of the Senate Finance Committee investigation, the Company's stock dropped 7.97%, on heavy trading volume, from a close of $56.21 on May 12, 2010 to a close of $51.73 on May 13, 2010.

7. Over a month after the announcement of the Senate Finance Committee's inquiry letter, on June 30, 2010, the Company announced that it "received a notice of formal investigation from the Securities and Exchange Commission (SEC) pertaining to the company, and received a subpoena for documents relating to the matters under review by the Senate Finance Committee." In response to the announcement, the Company's stock dropped 10.55%

3

from a close of $43.98 on June 30, 2010 to a close of $39.34 on July 1, 2010.

8.     The Company's stock took another significant drop on July 13, 2010 after the Company announced its estimated second quarter earnings of $1.12 a share, which was down from the $1.27 reported a year earlier and also below the $1.36 per share amount estimated by Thomson Reuters' analysts.   During the Company's earnings conference call on July 13, 2010, Michael Snow, Chief Operating Officer of Amedisys, stated that "the results of this quarter are a bit of a wake-up call."   As a result of this news, the Company's shares dropped over 24% from a close of $35.02 on July 12, 2010 to a close of $26.57 on July 13, 2010.

9.     Defendants' fraudulent income-generating scheme artificially inflated the price of Amedisys' securities.  As a result of the multiple disclosures concerning the Company's revenue and billing practices, the artificial inflation in the Company's securities was removed and the Company's stock price collapsed to $26.57 on July 13, 2010.  Due to this significant drop, Plaintiff and members of the Class were damaged.

## II.     JURISDICTION AND VENUE

10.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States ("U.S.").

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  At all relevant times, Amedisys maintained its headquarters and principal place of business in this District.  Many of the acts and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

13.     In connection with the acts alleged in the Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the U.S. mails, interstate telephone communications and the facilities of national securities exchanges.

## III. THE PARTIES

14.     Plaintiff Melvin W. Brinkley purchased shares of common stock of Amedisys during the Class Period as set forth in *Plaintiff's Certificate,* attached hereto as <u>Exhibit A</u>, and suffered damages as a result of the violations of the federal securities laws pled herein.

15.     Defendant Amedisys, which is headquartered in Baton Rouge, Louisiana, is a provider of high-quality, low-cost home health services to the chronic, co-morbid, aging American population.  For years 2007 through 2009, nearly 90% of the Company's services were primarily paid for by Medicare.  As of December 31, 2009, the Company owned and operated 521 Medicare-certified home health agencies and 65 Medicare-certified hospice agencies in 40 states within the United States, the District of Columbia and Puerto Rico.  The Company is incorporated in Delaware.

16.     Defendant William F. Borne ("Borne") founded Amedisys in 1982 and has served as Chairman of the Board of Directors and Chief Executive Officer since that time.  In this capacity, and as detailed herein, Borne signed certain of the Company's false and misleading filings with the SEC, including the fiscal years 2008 and 2009 Form 10-Ks and Sarbanes-Oxley Act of 2002 ("SOX") certifications; participated in drafting and/or approved the Company's false and misleading press releases; met with analysts and the media to discuss the Company; and participated in the Company's conference calls with analysts and investors.

17.     Defendant Dale E. Redman ("Redman") has served as the Company's Chief Financial Officer since February 21, 2007.  In this capacity, and as detailed herein, Redman signed certain of the Company's false and misleading filings with the SEC, including all quarterly Form 10-Qs filed during the Class Period and the fiscal years 2008 and 2009 Form 10-Ks; SOX certifications; participated in drafting and/or approved the Company's false and misleading press releases; met with analysts and the media to discuss the Company; and participated in the Company's conference calls with analysts and investors.

5

## IV.    DEFENDANTS' FRAUDULENT CONDUCT

18.    During the Class Period, the Individual Defendants and the Company engaged in a fraudulent income-generating scheme to boost the Company's financial results by providing unnecessary medical home-health care visits.

19.    Specifically, defendants engaged in a course of conduct whereby the Company's publicly reported revenue and earnings growth were materially inflated by the Company's fraudulent income-generating scheme of pushing patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured the Company more in Medicare reimbursements.  Moreover, the Company failed to disclose that part of the reported net service revenue and earnings were subject to recoupment by Medicare.  As a result, the Company also violated its Code of Ethical Business Conduct due to its scheme to inflate its Medicare revenue.  In furtherance of this fraudulent scheme, defendants also knew of or recklessly disregarded the defendant's extremely weak internal controls in such areas as patient recertification and billing processes.  The defendants also designed an income-generating scheme to wrongfully obtain Medicare bonuses by providing unnecessary services.

20.    As a result of this fraudulent income-generating scheme, defendants violated the federal securities laws in several ways.

21.    Defendants issued or caused the issuance of false and misleading statements, identified in Section V, and/or controlled persons who issued false and misleading statements regarding the Company's financial results and the quality of its internal controls in violation of Rule 10b-5(b) and § 20(a) of the Exchange Act.

22.    Defendants issued or caused Amedisys to issue false and misleading financial results.  As a result of the deceptive acts described herein, the Company's Class Period financial statements were materially misstated.

23.    Defendants also issued false and misleading statements regarding the quality of the Company's internal controls.  Moreover, defendants Borne and Redman also repeatedly signed sworn certifications regarding the accuracy of the Company's financial statements and the

6

adequacy of the Company's internal controls, which were materially misleading as these sworn certifications failed to reveal defendants' knowledge of Amedisys' fraudulent income-generating scheme and violations of its own Code of Ethical Business Conduct.

24.     In addition to making false statements, defendants each committed manipulative or deceptive acts in furtherance of a fraudulent scheme to defraud Medicare and manipulate the Company's financial condition in violation of Rule 10b-5(a) and (c) and § 20(a) of the Exchange Act.

25.     Throughout the Class Period, the Company and the Individual Defendants knew or were deliberately reckless in not knowing that part of the Company's revenues and earnings were created by defendants' fraudulent income-generating scheme.  Defendants were taking advantage of the Medicare reimbursement system by clustering at-home therapy visits around Medicare reimbursement targets.

26.     Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits.  In addition, Medicare paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits.  A former employee at Amedisys, Tracy Trusler ("Trusler"), was specifically told that "we have to have ten visits to get paid" and she was asked to look through patients' files to find those patients who were just shy of the ten visit mark and call their assigned therapist to remind them to make the extra appointment.   Trusler also stated that the "tenth visit was not always medically necessary."

27.     In January 2008, Medicare eliminated the $2,200 bonus payment at ten visits and began paying an extra fee at six, fourteen and twenty therapy visits.  Even after Medicare changed its reimbursement policies, the Company's pattern of pushing home therapy visits continued.  In 2008, there was a 50% drop in the percentage of Amedisys patients getting ten visits, but the patients receiving six visits increased 8%.  Moreover, the percentage of patients receiving fourteen visits rose 33% and the percentage receiving twenty visits increased 41%.

Case 3:10-cv-00497-BAJ-CN   Document 1    07/28/10   Page 7 of 44

## V.     DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

### A.     Defendants' False and Misleading Statements Prior to the Disclosures of the Fraudulent Income-Generating Scheme

28.     On April 30, 2008, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the first quarter ended March 31, 2008. The Company stated that it "posted record financial performance for the quarter with net service revenue and net income increasing 38.7% and 24.1%, respectively, over the first quarter of 2007." The Company also reported the following:

Three-Month Periods Ended March 31, 2008 and 2007

- Net service revenue for the first quarter of 2008 increased 38.7% to $213.1 million compared to $153.6 million in 2007.

- Net income increased 24.1% to $16.5 million compared to $13.3 million in 2007.

- Diluted earnings per share increased 21.6% to $0.62 compared to $0.51 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.6 million compared to 26.0 million in 2007.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 37.0% to $32.3 million compared to $23.6 million in 2007.

29.     Defendant Borne stated "[w]e are very pleased with our first quarter operations." Further, Borne stated "[i]n addition to an excellent quarter financially where we reported record revenue and strong EPS, we completed the acquisition of TLC, which we believe will be an outstanding investment for the company. With the integration of this milestone acquisition well underway, we will continue to focus on the execution of our long-term strategy of growing the business both internally and externally, and delivering high quality, cost-effective care to the patients entrusted to our service."

30.     On April 30, 2008, defendants also held an earnings conference call, during which, defendant Borne emphasized the Company's "excellent results for the first quarter." Defendant Redman also touted that the Company "began 2008 with another strong quarter."

31.     Also on April 30, 2008, the Company filed its Form 10-Q with the SEC for the

8

first quarter of 2008, which included the same false and misleading financial results previously reported to investors. The Form 10-Q was signed by defendant Redman and also included the SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical. Defendant Borne's certification states:

I, William F. Borne, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, of Amedisys, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

32.     Defendants' statements to the marketplace in ¶¶ 28- 31 were materially false and misleading and/or failed to disclose that: (i) the Company's publicly reported revenue and earnings growth were materially inflated by the Company's fraudulent income-generating scheme of pushing patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured the Company more in Medicare reimbursements; (ii) part of the Company's Medicare revenue and earnings was subject to recoupment by Medicare; (iii) the Company violated its Code of Ethical Business Conduct due to its fraudulent scheme to inflate Medicare revenue; and (iv) the Company lacked effective internal controls, particularly over its patient recertification and billing processes.

33.     On July 17, 2008, Amedisys issued a press release announcing an increase in 2008 revenue and earnings guidance. The Company stated, in relevant part, the following:

Net service revenue is anticipated to be in the range of $1.10 billion to $1.15 billion, including the anticipated impact of our recent acquisitions, but excluding the impact of any future acquisitions should they occur.

Diluted earnings per share, including the anticipated effect of our recent acquisitions, but excluding the effect of any future acquisitions, if they occur, are expected to be in the range of $3.00 to $3.10 (after adding back for one-time

10

expenses related to the acquisition of TLC Health Care Services, Inc. ("TLC")), based on an estimated 26.9 million shares outstanding. Previous guidance released by the Company on April 30, 2008 anticipated 2008 revenue to be $1.05 billion to $1.10 billion and diluted earnings per share to be $2.70 to $2.80.

34.     On July 29, 2008, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended June 30, 2008.  The Company also stated that "[w]e posted record financial performance for the three-month period ended June 30, 2008 with net service revenue and net income increasing 84.5% and 36.6%, respectively, over the three-month period ended June 30, 2007." The Company also reported the following:

Three-Month Periods Ended June 30, 2008 and 2007

-   Net service revenue increased 84.5% to $312.7 million compared to $169.5 million in 2007.

-   Net income increased 36.6% to $20.4 million compared to $14.9 million in 2007.

-   Diluted earnings per share increased 33.3% to $0.76 compared to $0.57 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.8 million compared to 26.2 million in 2007.

-   Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 68.7% to $44.3 million compared to $26.3 million in 2007.

-   After adding back $2.7 million ($1.6 million, net of income tax) or $0.06 per diluted share in certain TLC Health Care Services, Inc. ("TLC") integration costs[], the following would have been our results:

    -   Net income increased 47.5% to $22.0 million compared to $14.9 million in 2007;

    -   Diluted earnings per share increased 43.9% to $0.82 compared to $0.57 per diluted share in 2007; and

    -   Adjusted EBITDA increased 78.9% to $47.0 million compared to $26.3 million in 2007.

Six-Month Periods Ended June 30, 2008 and 2007

-   Net service revenue increased 62.8% to $525.8 million compared to $323.0 million in 2007.

-   Net income increased 30.8% to $36.8 million compared to $28.2 million in 2007.

11

- Diluted earnings per share increased 27.8% to $1.38 compared to $1.08 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.7 million compared to 26.1 million in 2007.

- EBITDA increased 53.7% to $76.6 million compared to $49.9 million in 2007.

- After adding back $2.7 million ($1.6 million, net of income tax) or $0.06 per diluted share in certain TLC integration costs[], the following would have been our results:

  - Net income increased 36.5% to $38.5 million compared to $28.2 million in 2007;

  - Diluted earnings per share increased 33.3% to $1.44 compared to $1.08 per diluted share in 2007; and

  - Adjusted EBITDA increased 59.1% to $79.3 million compared to $49.9 million in 2007.

35.    Defendant Borne noted that "[w]e are very happy with our second quarter results."   Borne also stated that "[t]he TLC acquisition was a strategic decision for our organization, expanding our coverage nationally during this time of payment reform. The integration of TLC is ahead of schedule and our new Specialty Division is progressing as projected."

36.    On July 29, 2008, defendants also held an earnings conference call, during which, defendant Borne emphasized that the Company had "outstanding result[s] for the second quarter."   Defendant Redman also touted that the Company "followed the first quarter of 2008 with another excellent quarter, highlighted by record revenue and earnings."

37.    Also on July 29, 2008, the Company filed its Form 10-Q with the SEC for the second quarter of 2008, which included the same false and misleading financial results previously reported to investors.  The Form 10-Q was signed by defendant Redman and also included the SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting.  The certifications were substantially identical to the certification quoted in

12

¶ 31.

38.     Defendants' statements to the marketplace in ¶¶ 33- 37 were materially false and misleading for the reasons set forth in ¶ 32.

39.     On October 28, 2008, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended September 30, 2008.   The Company also stated that "[w]e posted record financial performance for the three-month period ended September 30, 2008 with net service revenue and net income increasing 77.7% and 16.2%, respectively, over the three-month period ended September 30, 2007."  The Company also reported the following:

Three-Month Periods Ended September 30, 2008 and 2007

-   Net service revenue increased 77.7% to $321.6 million compared to $180.9 million in 2007.

-   Net income increased 16.2% to $23.5 million compared to $20.2 million in 2007.

-   Diluted earnings per share increased 13.0% to $0.87 compared to $0.77 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 27.0 million compared to 26.3 million in 2007.

-   Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 46.4% to $49.4 million compared to $33.7 million in 2007.

-   After adding back $1.1 million ($0.7 million, net of income tax) or $0.02 per diluted share in certain TLC Health Care Services, Inc. ("TLC") integration costs[] for the three month period in 2008, and excluding the $4.2 million or $0.16 per diluted share Alliance gain[] for the three-month period in 2007, the following would have been our results:

    -   Adjusted net income increased 50.9% to $24.1 million compared to $16.0 million in 2007;

    -   Adjusted diluted earnings per share increased 45.9% to $0.89 compared to $0.61 per diluted share in 2007; and

    -   Adjusted EBITDA increased 71.0% to $50.4 million compared to $29.5 million in 2007.

Nine-Month Periods Ended September 30, 2008 and 2007

-   Net service revenue increased 68.1% to $847.3 million compared to $503.9 million in 2007.

Case 3:10-cv-00497-BAJ-CN   Document 1    07/28/10   Page 13 of 44

- Net income increased 24.7% to $60.3 million compared to $48.4 million in 2007.

- Diluted earnings per share increased 21.6% to $2.25 compared to $1.85 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.8 million compared to 26.2 million in 2007.

- EBITDA increased 50.8% to $126.0 million compared to $83.6 million in 2007.

- After adding back $3.7 million ($2.3 million, net of income tax) or $0.08 per diluted share in certain TLC integration costs[] for the nine-month period in 2008, and excluding the $4.2 million or $0.16 per diluted share Alliance gain[] for the nine-month period in 2007, the following would have been our results:

  - Adjusted net income increased 41.7% to $62.6 million compared to $44.2 million in 2007;

  - Adjusted diluted earnings per share increased 37.9% to $2.33 compared to $1.69 per diluted share in 2007; and

  - Adjusted EBITDA increased 63.5% to $129.7 million compared to $79.3 million in 2007.

40. Defendant Borne noted that "[t]his has been another exceptional quarter and nine-months with record revenue and earnings per share. All TLC agencies have been converted and are now operating on our corporate operating systems including the Point of Care network."

41. On October 28, 2008, defendants also held an earnings conference call, during which, defendant Borne emphasized the Company's "outstanding results for the third quarter." Defendant Redman also touted the Company's performance by stating that "[o]ur third quarter was another excellent quarter for Amedisys, highlighted by record revenue and earnings."

42. Also on October 28, 2008, the Company filed its Form 10-Q with the SEC for the third quarter of 2008, which included the same false and misleading financial results previously reported to investors. The Form 10-Q was signed by defendant Redman and also included the SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical to the certification quoted in ¶ 31.

43. Defendants' statements to the marketplace in ¶¶ 39- 42 were materially false and

14

misleading for the reasons set forth in ¶ 32.

44. On January 6, 2009, Amedisys issued a press release stating, in part, the following:

> Net service revenue in 2009 is anticipated to be in the range of $1.425 billion to $1.475 billion, excluding the effects of future acquisitions, if they are made. Diluted earnings per share in 2009 is expected to be in the range of $4.10 to $4.30 based on an estimated 27.5 million shares outstanding, also excluding the effects of future acquisitions, if they are made.

45. On February 17, 2009, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the fourth quarter and the fiscal year ended December 31, 2008. The Company also stated that "[w]e posted record financial performance for the fourth quarter with net service revenue and net income increasing 75.3% and 57.6%, respectively, over the fourth quarter of 2007." The Company also reported the following:

Three-Month Periods Ended December 31, 2008 and 2007

- Net service revenue increased 75.3% to $340.1 million compared to $194.0 million in 2007.

- Net income increased 57.6% to $26.3 million compared to $16.7 million in 2007.

- Diluted earnings per share increased 54.0% to $0.97 compared to $0.63 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 27.1 million compared to 26.5 million in 2007.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 68.8% to $51.4 million compared to $30.4 million in 2007.

- After adding back $0.2 million or $0.01 per diluted share in certain TLC Health Care Services, Inc. ("TLC") integration costs[] for the three month period in 2008, the following would have been our results:

    - Adjusted net income increased 58.7% to $26.5 million compared to $16.7 million in 2007;

    - Adjusted diluted earnings per share increased 55.6% to $0.98 compared to $0.63 per diluted share in 2007; and

    - Adjusted EBITDA increased 69.7% to $51.7 million compared to $30.4 million in 2007.

15

<u>Years Ended December 31, 2008 and 2007</u>

- Net service revenue increased 70.1% to $1,187.4 million compared to $697.9 million in 2007.

- Net income increased 33.1% to $86.7 million compared to $65.1 million in 2007.

- Diluted earnings per share increased 29.8% to $3.22 compared to $2.48 per diluted share in 2007. The weighted average number of diluted shares outstanding increased to approximately 26.9 million compared to 26.3 million in 2007.

- EBITDA increased 55.6% to $177.4 million compared to $114.0 million in 2007.

- After adding back $4.0 million or $0.09 per diluted share in certain TLC integration costs[] for 2008, and excluding the $4.2 million or $0.16 per diluted share Alliance gain[] for 2007, the following would have been our results:

  - Adjusted net income increased 46.3% to $89.1 million compared to $60.9 million in 2007;

  - Adjusted diluted earnings per share increased 42.7% to $3.31 compared to $2.32 per diluted share in 2007; and

  - Adjusted EBITDA increased 65.2% to $181.4 million compared to $109.8 million in 2007.

46.     Defendant Borne noted that "[t]oday we are reporting outstanding results, with record revenue and earnings for both the fourth quarter and full year."  Borne also stated that "[t]his marks the sixth consecutive year that earnings per share growth has exceeded 20%."

47.     On February 17, 2009, defendants also held an earnings conference call, during which, defendant Borne stated that the Company "had another year of outstanding results." Defendant Redman also stated that the "fourth quarter 2008 was another excellent quarter for Amedisys, which ended a tremendous year in both financial performance and acquisition integration."

48.     Also on February 17, 2009, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2008 ("FY 2008"), which included the same false and misleading financial results previously reported to investors.  The Form 10-K was signed by defendants Borne and Redman and others.  In addition, the Form 10-K included the SOX

16

certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical to the certification quoted in ¶ 31.

49.     The Company stated in its FY 2008 Form 10-K that "[w]e establish and maintain processes and controls over coding, clinical operations, billing, compliance and patient recertifications to help ensure that we are compliant with Medicare requirements."  More specifically:

*Billing*

We maintain comprehensive controls over our billing processes to help ensure accurate and complete billing. We have company-wide annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; deploy operational "turnaround teams" when problems are identified; and terminate employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

*Patient Recertification*

In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care conference. We also use centralized automated compliance recertification indicators to identify and monitor agencies that have relatively high recertification levels.

*Compliance*

The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain comprehensive ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program is administered by our Chief Compliance Officer, a former state prosecutor, and includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential

hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation—compliance education; billing compliance training; and compliance presentations at all company functions, Our executive compliance committee includes our Chief Executive Officer, Chief Operating Officer and President, Chief Financial Officer, Chief Information Officer and Senior Vice President of Clinical Operations, Chief Compliance Officer, Senior Vice President of Human Resources and Senior Vice President of Internal Audit, and meets on a quarterly basis to establish the agenda for compliance initiatives and review the status of compliance initiatives and audits, as well as the operations of our Compliance Department.

50.     Furthermore, the Company stated the following in its FY 2008 Form 10-K:

***Medicare Participation***
As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations. CMS has indicated that it will be revising the current home health conditions of participation but a publication date of such revisions has not been established.

51.     Further, the Form 10-K for FY 2008 disclosed that Medicare represented approximately 87%, and 89% of the Company's net service revenue in 2008 and 2007, respectively.

52.     The FY 2008 Form 10-K also referenced the Company's Code of Ethical Business Conduct, which states that "Amedisys is serious about ethical conduct and complying with all laws that affect our business.  We will not take actions that undermine our ethical principles or violate legal requirements."  In addition, the Company stated that "[w]e also must maintain books and records and accounting controls for the entire Company that fairly and accurately reflect our income and expenses."  Moreover, the Record Keeping section states: "[n]ever enter false or misleading information into Company records."

18

53.     Furthermore, the Company's Code of Ethical Business Conduct states in relevant part:

V. BILLING

Amedisys officers and employees who are involved in the billing and collection function are expected to understand and comply with all billing-related policies and procedures established by the Company, as well as applicable requirements of third-party payors (including Medicare and Medicaid) to which home healthcare service and product claims are submitted.

Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate. In no event shall the Company bill for equipment beyond the date it is provided, and Amedisys should only bill for goods and services for which appropriate documentation exists.

All coding of services must conform to applicable government regulations and commercial payor instructions. All required billing information (including diagnosis coding) must be collected and recorded accurately. All contact with customers to obtain missing information must be properly documented.

Amedisys directors, officers and employees are expected to cooperate fully with all internal and external audits of the Company's billing system.

If you discover any coding error in the billing system, the matter should be brought to the attention of your supervisor so that he or she may determine the nature and magnitude of the problem and the appropriate corrective action. The Company's policy is to refund any overpayments received as a result of coding errors and to notify the appropriate carrier or commercial payor of the problem. All such matters should also be brought to the attention of your Director of Operations and, in the case of government billings, to the attention of the Chief Compliance Officer.

Amedisys may not routinely waive or write off co-payments and deductibles for services rendered. Such a practice could cause the Company to violate its contractual obligations to carriers as well as certain governmental regulations.

You should consult the Company's Billing Department and Finance Department for questions pertaining to government billing and commercial billing.

54.     Defendants' statements to the marketplace in ¶¶ 44- 53 were materially false and misleading for the reasons set forth in ¶ 32.

55.     On April 28, 2009, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended

19

March 31, 2009.  The Company also stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 60.4% and 64.1%, respectively over the three-month period ended March 31, 2008.fourth quarter and the year ended December 31, 2008."  The Company also reported the following:

<u>Three-Month Periods Ended March 31, 2009 and 2008</u>

- Net service revenue increased $128.7 million or 60.4% to $341.8 million compared to $213.1 million in 2008, with $82.7 million of the increase related to growth through our acquisitions.

- Net income attributable to Amedisys, Inc. increased $10.5 million or 64.1% to $27.0 million compared to $16.5 million in 2008

- Diluted earnings per share increased 59.7% to $0.99 compared to $0.62 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.3 million compared to 26.6 million in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 67.0% to $54.0 million compared to $32.3 million in 2008.

- Days revenue outstanding, net decreased 6.8 days to 40.4 days compared to 47.2 days at December 31, 2008 and 45.0 days at March 31, 2008.

56.     Defendant Borne noted that "[w]ith record revenue and earnings, the results of the first quarter were impressive."  Borne also stated the "[w]e have positioned Amedisys to be the provider of choice for elderly patients with complex chronic conditions. By providing low-cost, outcome driven care targeted to a chronically ill patient population, we believe that Amedisys can effectively provide for the healthcare needs of the highest-cost Medicare beneficiaries. This will be accomplished through continued focus on our three pronged business strategy that has been the foundation of our success, namely: providing superior clinical services, growing our business aggressively and becoming as operationally efficient as possible."

57.     On April 28, 2009, defendants also held an earnings conference call, during which, defendant Borne emphasized that the Company had "excellent results for the first quarter."  Defendant Redman also touted the Company's "record revenue and earnings."

58.     Also on April 28, 2009, the Company filed its Form 10-Q with the SEC for the first quarter of 2009, which included the same false and misleading financial results previously

20

reported to investors. The Form 10-Q was signed by defendant Redman and also included the SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical to the certification quoted in ¶ 31.

59.     Defendants' statements to the marketplace in ¶¶ 55- 58 were materially false and misleading for the reasons set forth in ¶ 32.

60.     On July 28, 2009, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three and six-month periods ended June 30, 2009. The Company stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 20.9% and 72.1%, respectively over the three-month period ended June 30, 2008." The Company also reported the following:

Three-Month Periods Ended June 30, 2009 and 2008

-   Net service revenue increased $65.2 million or 20.9% to $377.9 million compared to $312.7 million in 2008, with $54.0 million of the increase related to growth through base/start-up agencies.

-   Net income attributable to Amedisys, Inc. increased $14.7 million or 72.1% to $35.1 million compared to $20.4 million in 2008[.]

-   Diluted earnings per share increased 67.1% to $1.27 compared to $0.76 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.5 million compared to 26.8 million in 2008.

-   Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 52.0% to $67.4 million compared to $44.3 million in 2008.

Six-Month Periods Ended June 30, 2009 and 2008

-   Net service revenue increased $194.0 million or 36.9% to $719.7 million compared to $525.8 million in 2008, with $100.0 million of the increase related to growth through base/start-up agencies.

-   Net income attributable to Amedisys, Inc. increased $25.3 million or 68.5% to $62.1 million compared to $36.8 million in 2008[.]

Case 3:10-cv-00497-BAJ-CN   Document 1    07/28/10   Page 21 of 44

- Diluted earnings per share increased 63.8% to $2.26 compared to $1.38 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.4 million compared to 26.7 million in 2008.

- EBITDA increased 58.3% to $121.3 million compared to $76.6 million in 2008.

61. Defendant Borne noted, in relevant part, "[t]he continued focus of our three pronged business strategy of providing superior clinical services, growing our business aggressively and becoming as operationally efficient as possible is evident in the record revenue and earnings that we are reporting today."

62. On July 28, 2009, defendants also held an earnings conference call, during which, defendant Borne emphasized the Company's "outstanding results for the second quarter." Moreover, defendant Redman stated that the "second quarter of 2009 was an excellent quarter for Amedisys, as evidenced by our strong earnings and cash flow performance."

63. Also on July 28, 2009, the Company filed its Form 10-Q with the SEC for the second quarter of 2009, which included the same false and misleading financial results previously reported to investors. The Form 10-Q was signed by defendant Redman and also included the SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical to the certification quoted in ¶ 31.

64. Defendants' statements to the marketplace in ¶¶ 60- 63 were materially false and misleading for the reasons set forth in ¶ 32.

65. On October 27, 2009, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three and nine-month periods ended September 30, 2009. The Company stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 20.7% and 53.0%, respectively, over the three-month period ended September 30, 2008." The

22

Company also reported the following:

Three-Month Periods Ended September 30, 2009 and 2008

- Net service revenue increased $66.7 million or 20.7% to $388.3 million compared to $321.6 million in 2008, with $53.2 million of the increase related to growth through base/start-up agencies.

- Net income attributable to Amedisys, Inc. increased $12.4 million or 53.0% to $35.9 million compared to $23.5 million in 2008[.]

- Diluted earnings per share increased 48.3% to $1.29 compared to $0.87 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.9 million compared to 27.0 million in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 40.0% to $69.1 million compared to $49.4 million in 2008.

Nine-Month Periods Ended September 30, 2009 and 2008

- Net service revenue increased $260.7 million or 30.8% to $1.1 billion compared to $847.3 million in 2008, with $153.3 million of the increase related to growth through base/start-up agencies.

- Net income attributable to Amedisys, Inc. increased $37.7 million or 62.5% to $98.0 million compared to $60.3 million in 2008[.]

- Diluted earnings per share increased 57.8% to $3.55 compared to $2.25 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.6 million compared to 26.8 million in 2008.

- EBITDA increased 51.1% to $190.4 million compared to $126.0 million in 2008.

66. Defendant Borne noted, in relevant part, "[w]e are pleased to report another strong quarter."

67. On October 27, 2009, defendants also held an earnings conference call, during which, defendant Borne stated, "[w]e had an outstanding result for the third quarter, reporting net revenue of 388 million and earnings per diluted share of $1.29." Borne further stated that "we achieved record revenue and earnings per share for the quarter." In addition, Borne disclosed that the Company "engaged the Marwood Group, one of the nation's preeminent healthcare

consulting firms to provide an independent analysis of the company's procedures, controls, clinical infrastructure, corporate complaint processes, technology offerings and future strategies." Marwood Group's result showed that "Amedisys ranked highest compared to other publicly-traded home health companies, in terms of quality management and complaint processes."

68. Furthermore, during the earnings conference call, in response to a question by an analyst regarding negative stories about the Company, Borne stated that "[w]e are a leader in the industry and industry leaders typically are targets. We are the most transparent home health company in the nation."

69. On October 27, 2009, the Company filed its Form 10-Q with the SEC for the third quarter 2009, which included the same false and misleading financial results previously reported to investors. The Form 10-Q was signed by defendant Redman and also included the SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical to the certification quoted in ¶ 31.

70. Defendants' statements to the marketplace in ¶¶ 65- 69 were materially false and misleading for the reasons set forth in ¶ 32.

71. On February 23, 2010, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three and the year ended December 31, 2009. The Company stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 19.2% and 43.5%, respectively, over the three-month period ended December 31, 2008." The Company also reported the following:

Three-Month Periods Ended December 31, 2009 and 2008

- Net service revenue increased $65.4 million or 19.2% to $405.5 million compared to $340.1 million in 2008, with $52.7 million of the increase related to growth through base/start-up agencies.

- Net income attributable to Amedisys, Inc. increased $11.5 million or 43.5% to $37.8 million compared to $26.3 million in 2008[.]

- Diluted earnings per share increased 39.2% to $1.35 compared to $0.97 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 28.1 million compared to 27.1 million in 2008.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 38.8% to $71.3 million compared to $51.4 million in 2008.

Years Ended December 31, 2009 and 2008

- Net service revenue increased $326.1 million or 27.5% to $1.5 billion compared to $1.2 billion in 2008, with $206.0 million of the increase related to growth through base/start-up agencies.

- Net income attributable to Amedisys, Inc. increased $49.1 million or 56.7% to $135.8 million compared to $86.7 million in 2008

- Diluted earnings per share increased 51.9% to $4.89 compared to $3.22 per diluted share in 2008. The weighted average number of diluted shares outstanding increased to approximately 27.7 million compared to 26.9 million in 2008.

- EBITDA increased 47.5% to $261.8 million compared to $177.4 million in 2008.

72.    Defendant Borne noted, in relevant part, "[w]e had outstanding results for the fourth quarter and full year ending 2009. This marks the seventh consecutive year in which we have increased our earnings per share in excess of 20%."

73.    On February 23, 2010, the Company also held an earnings conference call during which, Borne reiterated that the Company "achieved record revenue and earnings-per-share growth."  Redman also stated that "2009 was highlighted by record revenue and earnings, a double-digit reduction in day's revenue outstanding and 247 million in cash flow from operations."

74.    On February 23, 2010, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2009 ("FY 2009"), which included the same false and misleading financial results previously reported to investors.  The Form 10-K was signed by

25

defendants Borne and Redman and others. In addition, the Form 10-K included SOX certifications by defendants Borne and Redman attesting to the accuracy of the Company's financial statements and the adequacy of the Company's internal controls over financial reporting. The certifications were substantially identical to the certification quoted in ¶ 31.

75. Further, the Form 10-K for FY 2009 disclosed that Medicare represented approximately 88%, 87%, and 89% of the Company's net service revenue in 2009, 2008 and 2007, respectively.

76. The Company stated in its Form 10-K that "[w]e establish and maintain processes and controls over coding, clinical operations, billing, patient recertifications and compliance to help monitor and promote compliance with Medicare requirements." More specifically:

*Billing*

We maintain controls over our billing processes to help promote accurate and complete billing. In order to promote the accuracy and completeness of our billing, we have annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; and take prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

*Patient Recertification*

In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care team conference. We also monitor centralized automated compliance recertification metrics to identify, monitor, and where appropriate audit, agencies that have relatively high recertification levels.

*Compliance*

The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program includes a Code of Ethical Business Conduct for our employees, officers,

directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation compliance training; billing compliance training; and compliance presentations at all company functions.

77.     Furthermore, the Company stated the following in its FY 2009 Form 10-K:

*Medicare Participation*

As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the United States Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations. CMS has indicated that it will be revising the current home health conditions of participation but a publication date of such revisions has not been established.

CMS has engaged a number of third party firms, including recovery audit contractors ("RACs") and Medicaid Integrity Contributors ("MICs"), to conduct extensive reviews of claims data and state and federal government health care program laws and regulations applicable to companies that operate home health and hospice agencies. These audits will evaluate the appropriateness of billings submitted for payment, and are expected to further intensify the regulatory environment surrounding the healthcare industry. In addition to identifying overpayments, audit contractors can refer suspected violations of law to government enforcement authorities.

78.     The FY 2009 Form 10-K also referenced the Company's Code of Ethical Business Conduct, as detailed above in ¶¶ 52 - 53.

79.     Defendants' statements to the marketplace in ¶¶ 71- 78 were materially false and misleading for the reasons set forth in ¶ 32.

**B.     Disclosures of Defendants' Fraudulent Income-Generating Scheme and Defendants' Continuing False and Misleading Statements**

80.     On April 26, 2010, after the market closed, *The Wall Street Journal* ("WSJ")

published an article, "*Home Care Yields Medicare Bounty*," ("April 26 WSJ Article") questioning whether health-care companies, including Amedisys, were taking advantage of the Medicare reimbursement system by clustering at-home therapy visits around Medicare reimbursement targets. The article disclosed the following in relevant part:

> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.

> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

> "I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

> "The tenth visit was not always medically necessary," Ms. Trusler says.

> ***

> The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than $80 per visit.

> Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency"

of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

*** 

In 2000, Medicare rolled out its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many times a nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed.

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

81.     Before the market opened on April 27, 2010, defendants caused the Company to issue a press release falsely and/or misleadingly stating the Company's financial results for the three-month period ended March 31, 2010.  The Company stated that "[w]e posted record financial performance with net service revenue and net income attributable to Amedisys, Inc., increasing 20.8% and 35.6%, respectively, over the three-month period ended March 31, 2009." The Company also reported the following:

Three-Month Periods Ended March 31, 2010 and 2009

- Net service revenue increased $71.2 million or 20.8% to $413.0 million compared to $341.8 million in 2009, with $58.7 million of the increase related to growth through base/start-up agencies.

- Net income attributable to Amedisys, Inc. increased $9.6 million or 35.6% to $36.6 million compared to $27.0 million in 2009

- Diluted earnings per share increased 30.3% to $1.29 compared to $0.99 per diluted share in 2009. The weighted average number of diluted shares outstanding increased to approximately 28.4 million compared to 27.3 million in 2009.

- Earnings before interest, taxes, depreciation and amortization ("EBITDA") increased 31.0% to $70.7 million compared to $54.0 million in 2009.

82.     On April 27, 2010, the Company held an earning call during which the false and misleading financial results were repeated.  Defendant Redman emphasized that "Amedisys has again posted another great quarter."  In addition, when asked specifically about the April 26 WSJ Article – "how Amedisys can be so efficient at picking patients, at billing so correctly, so many times, at generating such high degree of consistency about optimizing Medicare reimbursements, under a specific rule."  Borne responded and stated, in part, that "[n]obody that we have come across has the type of approach and structure [that we do], and there is really something called

30

leverage and critical mass. And that's how we can be a little more effective." Borne stated that "we are very specific with care algorithms." In addition, Borne stated that "what we are trying to do as an organization is to be consistent in the assessment and the delivery of care, through care tracks, and the outcomes that we achieve. And that's why we are so effective and consistent at this, because that's where our strategy is." The Company's stock dropped 6.58% on heavy trading volume from a close of $60.5 on April 26, 2010 to a close of $56.52 on April 27, 2010.

83. Moreover, during the Bank of America Merrill Lynch Healthcare Conference held on May 11, 2010, defendant Redman continued to tout the Company's "[s]trong revenue growth."

84. Defendants' statements to the marketplace in ¶¶ 81- 83 were materially false and misleading for the reasons set forth in ¶ 32.

85. After the market closed on May 12, 2010, the WSJ published an article, "*Senators Question In-Home Caregivers*," disclosing that the Senate Finance Committee launched an investigation into the practices of Amedisys and other companies that provide in-home therapy visits.

86. The following day after the market opened on May 13, 2010, the Company issued a press release announcing that it received a letter of inquiry on May 12, 2010 ("May 12 Senate Letter") from the Senate Committee on Finance and that the Company "will cooperate with the Committee's inquiry."

87. The May 12 Senate Letter addressed to defendant Borne referenced the findings in the April 26 WSJ Article – "[t]he findings reported in the *Wall Street Journal* article are of great concern to us, especially since they appear to be confirmed by MedPAC's research. These findings suggest that HHAs [home health agencies] are basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients." Moreover, the May 12 Senate Letter stated that the Senate Finance Committee was interested in the Company's "Balanced For Life" program and stated that the referral form for the program "raises concerns that the program may be taking advantage of Medicare payments in order to

31

improve company profits." In addition, the May 12 Senate Letter requested the Company to produce thirteen different categories of documents, including data regarding therapy visits covering 2006 through 2009 and responses were due no later than June 2, 2010.

88. After the announcement of the Senate Finance Committee investigation, the Company's stock dropped 7.97%, on heavy trading volume, from a close of $56.21 on May 12, 2010 to a close of $51.73 on May 13, 2010.

89. Over a month after the announcement of the Senate Finance Committee's inquiry letter, the Company announced, after the market closed on June 30, 2010, that it "received a notice of formal investigation from the Securities and Exchange Commission (SEC) pertaining to the company, and received a subpoena for documents relating to the matters under review by the Senate Finance Committee." In response to the announcement, the Company's stock dropped 10.55% from a close of $43.98 on June 30, 2010 to a close of $39.34 on July 1, 2010.

90. Eugene Goldenberg ("Goldenberg"), analyst for BB&T Capital Markets, stated in a July 1, 2010 report that "[a]ccording to the company, the SEC has given AMED until July 17 to provide the requested information. While most of the information requests seem to revolve around Medicare reimbursement for therapy visits and are similar to those made by the Senate Finance Committee in mid-May, the scope of the inquiry appears to be more encompassing." Goldenberg also stated that "AMED is planning on requesting an extension for its July 17 deadline." Goldenberg stated that "[w]hile the company's fundamentals appear intact, we are downgrading AMED's shares to Hold (2) on increased headline risk created by this investigation."

91. The Company's stock took another significant drop on July 13, 2010 after the Company issued a press release and held an earnings conference call in which it announced that the Company's "second quarter net income will be approximately $1.12 per share." The Company stated that the $1.12 per share result included "non-recurring costs [of $0.17 per share] associated with the realignment of operations including legal, training, agency closings, closing severance as well as the Senate Finance Committee and SEC investigations." Moreover, of the

32

$0.17 per share amount, a "quarter had to do with sort of extraordinary cost related to legal and the Senate Finance Committee and that sort of thing." The $1.12 per share result was down from the $1.27 reported a year earlier and also below the $1.36 per share amount estimated by analysts.

92.     During the July 13, 2010 earnings conference call, the Company stated that "the results of this quarter are a bit of a wake-up call." Defendant Borne commented on the April 26 WSJ Article and stated that the reporter presented an "unbalanced story." The Company attempted to reassure investors that "despite these distractions, we're focused on operating our current business. We have a preplanned operating strategy, deliver great quality of care to our patients, grow our business, and become as efficiently as possible."

93.     As a result of this news, the Company's shares dropped over 24% from a close of $35.02 on July 12, 2010 to a close of $26.57 on July 13, 2010.

94.     Moreover, on July 14, 2010 analysts downgraded the Company's stock. The Company's stock closed at $25.76 on July 14, down over 3% from the prior day's close.

## VI.     ADDITIONAL ALLEGATIONS OF SCIENTER

95.     As alleged above, defendants acted with scienter in that they directed and/or participated in the fraudulent acts.

96.     Defendants' desire to personally benefit from the fraudulent income-generating scheme also provides further evidence of defendants' scienter.

97.     The Company's incentive compensation plans further motivated the Individual Defendants to boost the Company's earnings. The Company's proxy statement for the 2008 fiscal year, filed on April 28, 2009 disclosed that "[f]or 2008, the incentive compensation opportunity was based on overall corporate performance measure of diluted earnings per share ('EPS')." If the 2008 EPS performance levels of $2.32 threshold, $2.40 target, $2.50 maximum were met, then the inventive earned as a percentage of target were 50%, 100% or 150% respectively. The Company reported that actual 2008 EPS performance "substantially exceeded the maximum targeted EPS." As a result, Borne received a $1,125,000 cash bonus and Redman

received a $281,250 cash bonus.

98.    The Company's proxy statement for the 2009 fiscal year, filed on April 27, 2010 disclosed that "[f]or 2009, the incentive compensation opportunity was based on the overall corporate performance measure of earnings per share ('EPS')."  If the 2009 EPS performance levels of $3.90 threshold, $4.20 target or $5.00 maximum were met, then the incentive earned as a percentage of target were 50%, 100% or 150% respectively.  The Company reported that actual 2009 EPS performance was $4.89 or approximately 143% of the 2009 target EPS level.  As a result, Borne received a $1,072,500 cash bonus and Redman received a $455,813 cash bonus.

## VII.    LOSS CAUSATION

99.    Defendants' fraudulent income-generating scheme operated as a fraud or deceit on Plaintiff and members of the Class because the false and misleading statements artificially inflated Amedisys' securities prices throughout the Class Period.  Indeed, the false and misleading representations concerning Amedisys' financial results and internal controls caused and maintained the artificial inflation in the Company's securities prices throughout the Class Period and until the truth was slowly revealed to the market.

100.    Throughout the Class Period, as detailed above, the prices of the Company's securities were artificially inflated as a direct result of defendants' misrepresentations and omissions regarding the Company.  When the truth about the Company was partially revealed to the market beginning with the April 26, 2010 WSJ Article, some of the inflation that had been caused by defendants' misrepresentations and omissions was eliminated from the price of the Company's securities, causing significant damages to Plaintiff and other Class members.

101.    The April 26 WSJ Article questioning whether health-care companies, including Amedisys, were taking advantage of the Medicare reimbursement system by clustering at-home therapy visits around Medicare reimbursement targets reported that "Amedisys provided many of its patients just enough therapy visits [over nine] to trigger the extra $2,200 payment.  In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more."  In addition, a former Amedisys nurse was quoted as saying

Case 3:10-cv-00497-BAJ-CN   Document 1   07/28/10   Page 34 of 44

that "[t]he tenth visit was not always medically necessary." As a result, the Company's stock dropped 6.58% on heavy trading volume from a close of $60.50 on April 26, 2010 to a close of $56.52 on April 27, 2010.

102. Then, on May 12, 2010, after the market closed, the WSJ published a follow-up article in which it reported that the Senate Finance Committee sent a letter to the Company informing it that they had started an investigation into the billing and operating practices of Amedisys. After the announcement of the Senate Finance Committee investigation, the Company's stock dropped 7.97%, on heavy trading volume, from a close of $56.21 on May 12, 2010 to a close of $51.73 on May 13, 2010.

103. Then on June 30, 2010, the Company announced that it "received a notice of formal investigation from the Securities and Exchange Commission (SEC) pertaining to the company, and received a subpoena for documents relating to the matters under review by the Senate Finance Committee." In response to this announcement, the Company's stock dropped 10.55% from a close of $43.98 on June 30, 2010 to a close of $39.34 on July 1, 2010.

104. The Company's stock took another significant drop on July 13, 2010 after its second quarter fiscal year 2010 financial results were released. The Company's estimated second quarter earnings of $1.12 a share was down from the $1.27 reported a year earlier and also below the $1.36 per share amount estimated by Thomson Reuters' analysts. As a result of this news, the Company's shares dropped *over 24%* from a close of $35.02 on July 12, 2010 to a close of $26.57 on July 13, 2010.

105. The removal of the artificial inflation through declines in the Company's securities prices following these revelations resulted in Plaintiff and other members of the Class suffering damages. These declines and corresponding losses are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented or concealed by defendants and to the market's adjustment of the Company's securities prices to reflect the newly emerging truth about the Company's condition.

106. The totality of the circumstances around the common stock price drops combine

35

to negate any inference that the economic loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or company-specific facts unrelated to defendants' fraudulent conduct. Had Plaintiff and other members of the Class known of the material adverse information not disclosed by defendants named herein, or been aware of the truth behind these defendants' material misstatements, they would not have purchased Amedisys securities at artificially inflated prices.

## VIII.  NO SAFE HARBOR

107.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements set forth in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements set forth herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update those statements which later became inaccurate.

## IX.    PRESUMPTION OF RELIANCE

108.   The market for the Company's securities was, at all times, an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

(a)    Amedisys stock was actively traded on the Nasdaq;

(b)     The market price of Amedisys securities reacted promptly to the dissemination of public information regarding the Company;

(c)     Securities analysts followed and published research reports regarding Amedisys that were publicly available to investors;

(d)     The average weekly trading volume for Amedisys stock during the Class Period was approximately 4.41 million shares; and

(e)     The Company's market capitalization was in excess of $735 million on July 14, 2010 and the Company had over 28.4 million shares outstanding as of July 14, 2010.

109.     Throughout the Class Period, the Company was consistently followed by the market, including securities analysts as well as the business press. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Amedisys and the Individual Defendants continued to pump materially false information into the marketplace regarding the financial condition of the Company. This information was promptly reviewed and analyzed by the ratings agencies, analysts and institutional investors and assimilated into the price of the Company's securities.

110.     As a result of the misconduct alleged herein (including defendants' misstatements and omissions), the market for Amedisys securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which defendants are each responsible.

111.     Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Amedisys securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

112.     Had Plaintiff and other members of the Class known of the material adverse

information not disclosed by defendants, or been aware of the truth behind defendants' material misstatements, they would not have purchased Amedisys securities at artificially inflated prices.

## X.   CLASS ACTION ALLEGATIONS

113.   Plaintiff brings this action on their own behalf and as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities (the "Class") who acquired the securities of Amedisys during the period from April 30, 2008 through July 12, 2010, inclusive, and who suffered damages as a result.  Excluded from the Class are: (i) the defendants; (ii) members of the family of any defendant; (iii) any person who was an officer or director of Amedisys during the Class Period; (iv) any firm, trust, corporation, officer, or other entity in which any defendant has a controlling interest; and (v) the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

114.   The Class is so numerous that joinder of all Class members is impracticable. Amedisys common stock was actively traded on the Nasdaq, an efficient market, throughout the Class Period.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number in the tens of thousands.  During the Class Period there were millions of shares of Amedisys common stock outstanding.  Based upon the volume of trading of Amedisys' common stock during the Class Period, it is believed that tens of thousands of investors purchased Amedisys common stock during the Class Period, rendering joinder of all such purchasers impracticable.

115.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all Class members sustained damages as a result of the wrongful conduct complained of herein.

116.   Plaintiff will fairly and adequately protect the interests of the Class members and have retained Court-appointed counsel competent and experienced in class action and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class members that Plaintiff seeks to represent.

117.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the wrongful conduct alleged herein.

118.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether documents, including the Company's SEC filings, press releases and public statements made by defendants during the Class Period, contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(c)    whether defendants acted with the requisite state of mind in omitting and/or misrepresenting material facts in the documents filed with the SEC, press releases and public statements;

(d)    whether the market prices of Amedisys' common stock during the Class Period were artificially inflated due to the material misrepresentations complained of herein; and

(e)    whether the Class members have sustained damages and, if so, the appropriate measure thereof.

119.    Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

120.    Notice can be provided to the record owners of Amedisys stock via first class mail using techniques and a form of notice similar to those customarily used in securities class

39

actions.

## XI.    CLAIMS FOR RELIEF

### Count I

#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
#### Promulgated Thereunder Against All Defendants

121.    Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

122.    Throughout the Class Period, Amedisys and the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the U.S. mail, engaged and participated in a continuous course of conduct to conceal adverse material information about Amedisys, including its true financial results and internal controls, as specified herein.  This plan, scheme and course of conduct was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; (b) artificially inflate the market price of Amedisys securities; and (c) cause Plaintiff and other members of the Class to purchase Amedisys securities at artificially inflated prices.

123.    In furtherance of this unlawful scheme, plan and course of conduct, the Individual Defendants, individually and jointly, took the actions set forth herein. Indeed, while in possession of material, adverse non-public information, these defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to create and maintain artificially high market prices for Amedisys' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Each of the Individual Defendants was a direct, necessary and substantial participant in the common course of conduct alleged herein.

124.    The Individual Defendants knew or, but for their deliberate recklessness, should

Case 3:10-cv-00497-BAJ-CN   Document 1   07/28/10   Page 40 of 44

have known, that the Company's reported financial results during the Class Period, as filed with the SEC and disseminated to the investing public, were materially overstated. Further, these defendants knew of existing adverse facts which undermined their representations about Amedisys existing business, internal controls and prospects during the Class Period.

125. In addition to the duties of full disclosure imposed on the Individual Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Individual Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.1-01, et seq.) and Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's financial condition, earnings and expenses so that the market price of the Company's securities would be based on truthful, complete and accurate information.

126. Amedisys and the Individual Defendants, the top executive officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers of the Company, each of these individual defendants was able to and did control the content of the public statements disseminated by Amedisys. With knowledge of the falsity and/or misleading nature of the statements contained therein and in reckless disregard of the true financial results of the Company, these defendants caused the heretofore complained of public statements to contain misstatements and omissions of material facts as alleged herein.

127. Amedisys and the Individual Defendants acted with scienter throughout the Class Period in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management of the Company and were therefore directly responsible for the false and misleading statements and/or omissions

41

disseminated to the public through press releases, news reports and filings with the SEC.

128.    Defendants' misrepresentations and/or omissions were intentional or reckless and done for the purpose of enriching themselves at the expense of Plaintiff and the Class and to conceal the Company's true operating condition from the investing public.  Defendants engaged in this scheme to inflate the Company's reported revenues and prospects in order to create the illusion that Amedisys was a successful, strong and growing company.

129.    As a result of those deceptive practices and false and misleading statements and/or omissions, the market price of Amedisys' securities was artificially inflated throughout the Class Period.  In ignorance of the false and misleading nature of the representations and/or omissions described above and the deceptive and manipulative devices employed by defendants, Plaintiff and the other members of the Class, in reliance on either the integrity of the market or directly on the statements and reports of defendants and the statements for which they are responsible, purchased Amedisys securities at artificially inflated prices and were damaged thereby.

130.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by defendants or been aware of the truth behind defendants' material misstatements, they would not have purchased Amedisys securities at artificially inflated prices.

131.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## Count II

### Violations of Section 20(a) of the Exchange Act Against Individual Defendants

132.    Plaintiff repeats and re-alleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

133.    Defendant Borne, by virtue of his position with Amedisys and his specific acts, was a controlling person of Amedisys within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and exercised same to cause Amedisys to engage in the illegal conduct and practices complained of herein.  Defendant Borne was the Company's Founder and

CEO, and actively managed the Company and its reporting to investors and its accounting practices. Defendant Borne was thereby and otherwise a culpable participant in the fraud perpetrated by defendants.

134.    Defendant Redman, by virtue of his position with Amedisys and his specific acts, was a controlling person of Amedisys within the meaning of Section 20(a) of the Exchange Act. He had the power and influence and exercised same to cause Amedisys to engage in the illegal conduct and practices complained of herein. Defendant Redman was the Company's CFO, and actively managed the Company and its reporting to investors and its accounting practices. Defendant Redman was thereby and otherwise a culpable participant in the fraud perpetrated by defendants.

135.    By reason of the conduct of Amedisys as alleged in this Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct of Amedisys and liable to Plaintiff and the Class for the substantial damages which they suffered in connection with their purchases or acquisitions of shares as a result of Amedisys' violations of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class;

B.      Awarding Plaintiff and the Class compensatory damages and/or rescission;

C.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest;

D.      Awarding Plaintiff and the Class the fees and expenses incurred in this action, including expert witness fees and attorneys fees; and

E.      Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Date:  July 28, 2010

By:   /s/ Eric R. Nowak_____
Eric R. Nowak (#27025)
Shirin E. Harrell (#27495)
**HARRELL & NOWAK, LLC**
650 Poydras St., Suite 2107
New Orleans, LA 70130
Phone:  (504)-522-7885
Fax:  (504)-528-3131
enowak@harrell-nowak.com

Jeffrey C. Block
**BERMAN DeVALERIO**
One Liberty Square
Boston, MA  02109
Phone:  (617) 542-8300
Fax:  (617) 542-1194
JBlock@bermandevalerio.com

Christopher Heffelfinger
Julie J. Bai
**BERMAN DeVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Tel:  (415) 433-3200
Fax:  (415) 433-6382

Roy L. Jacobs
**ROY JACOBS & ASSOCIATES**
60 East 42nd Street 46th Floor
New York, NY 10165
Phone:  212-867-1156
Fax:  212-504-8343 (Fax)
Rjacobs@jacobsclasslaw.com

*Counsel for Plaintiff*

Case 3:10-cv-00497-BAJ-CN   Document 1   07/28/10   Page 44 of 44